**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| AZURITY PHARMACEUTICALS, INC., *et al.*, | HONORABLE KAREN M. WILLIAMS |
| Plaintiff, | Civil Action No. 22-143 (KMW-EAP) |
| v. | |
| ALKEM LABORATORIES LTD., | **OPINION** |
| Defendant. | |

APPEARANCES:

KATHERINE ANN ESCANLAR, ESQ.
ARNOLD B. CALMANN, ESQ.
SAIBER LLC
ONE GATEWAY CENTER, 9TH FLOOR
SUITE 950
NEWARK, NJ 07102

ELHAM F. STEINER, ESQ.
JODY KAROL, ESQ.
WILSON, SONSINI, GOODRICH & ROSATI P.C.
12235 EL CAMINO REAL
SAN DIEGO, CA 92130

 *Counsel for Plaintiff and Counter Defendant Azurity Pharmaceuticals, LLC*

GREGORY D. MILLER, ESQ.
RIVKIN RADLER LLP
25 MAIN STREET, SUITE 501
COURT PLAZA NORTH
HACKENSACK, NJ 07601

SAMUEL T. LOCKNER, ESQ.
JENNELL C. BILEK, ESQ.
CARLSON, CASPERS, VANDENBURGH & LINDQUIST
225 SOUTH SIXTH STREET, SUITE 4200
MINNEAPOLIS, MN 55402

 *Counsel for Defendant and Counter Claimant Alkem Laboratories, LTD.*

**WILLIAMS, District Judge:**

## I.    INTRODUCTION

The lawsuit arises out of Alkem's submission of approval for a generic version of Azurity's "Nymalize" drug, which helps to mitigate symptoms of brain bleed. ECF No. 107, Plaintiff's Opening Markman Brief at 2 ("Pl.'s Open M. Br."). Azurity filed the instant action for patent infringement on the following patents: United States Patent Nos. 10,342,787 ("the '787 patent"), 10,576,070 ("the '070 patent"), 11,207,306 ("the '306 patent"), and 11,413,277 ("the '277 patent"), (collectively the "Patents-in-Suit"). Second Amend. Compl. ¶1. The innovation of Azurity's patents stems from the ability of the active ingredient nimodipine to be stabilized in a non-aqueous liquid form. Pl.'s Open M. Br. at 2. Therefore, the crux of the instant dispute regarding claim construction focuses on whether the claims are limited to non-aqueous liquid compositions.

Prior to the '277 patent, the '787, '070, and '306 patents, which Defendant argues have the same specification, all define "the composition" in Claim 1 as a "non-aqueous liquid composition." Defendant's Markman Presentation at 11. These prior patents were filed in 2019, 2020, and December of 2021. *Id.* On November 19, 2021, the '277 patent application defined "the composition" in Claim 1 as "non-aqueous liquid compositions" and had the same specification as the previous patents. Then, on December 22, 2021, Plaintiff cancelled certain claims and replaced them with just the term "composition." *Id.*

Defendant argues that the change in the claim construction between the '306 patent (and those previous) and the '277 patent was initiated because Defendant submitted a Notice Letter of Defendant's ANDA Product on November 29, 2021. *See id.* at 21. Defendant alleges that the change is designed to preclude market competition by Defendant's generic and that Plaintiff's

changes to the claim terms do not reflect the intrinsic record or the invention itself. Def.'s Markman Tr. at 17:1-18:4.

## II.     DISPUTED TERMS

### i.   The Dispute

Plaintiff argues that no construction is necessary for the term "composition" in the '277 patent claims and the constructions proposed for "dosage unit" and "first unit dose" must comport with the intrinsic record which must be considered to resolve the disputes at bar. *See* ECF No. 108, Defendant's Opening Markman Brief at 1 ("Def.'s Open M. Br."). Defendant believes that Plaintiff's constructions are "not a good-faith attempt to capture an invention" as disclosed in the intrinsic record, rather the constructions are designed to expand the claims beyond the invention to maintain exclusivity under the patent and "thwart rightful generic competition." *Id.*

The invention claimed is:

1. A composition comprising nimodipine as the only active ingredient and one or more solvents selected from ethanol, polyethylene glycol. and glycerin, wherein about 5% or less nimodipine degradation is observed over a period of at least six months when exposed to 40° C. and 75% relative humidity, and the concentration of nimodipine in the composition is about 6 mg/mL.

2. The composition of claim 1, further comprising from about 0.01% to about 1.5% nimodipine related compound A.

3. The composition of claim 1, wherein nimodipine is present in an amount from about 10 mg to about 100 mg per dosage unit.

4. The composition of claim 1, wherein nimodipine is present in an amount of about 60 mg per dosage unit.

5. A method of improving neurological outcome by reducing the incidence and severity of ischemic deficits in patients with subarachnoid hemorrhage from ruptured intracranial berry aneurysms comprising enterally administering to a patient in need thereof an effective amount of the composition of claim 1.

6. The method of claim 5, wherein the composition is administered orally, via nasogastric tube or via gastric tube.

7. The method of claim 5, wherein a first unit dose of the composition is administered to the patient within about 100 hours of the subarachnoid hemorrhage.

8. The method of claim 5, wherein the composition is administered about every four hours.

Def.'s Open M. Br. at Ex. 1 ('277 patent).

**Terms in Dispute**

The parties ask the Court to settle the dispute regarding the construction of three terms:

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "Composition" | No construction required. | Liquid composition containing less than 1% water by volume, *i.e.*, non-aqueous liquid composition. |
| "Dosage Unit" | One dose of the composition as administered to a patient at a time. | One does of the non-aqueous liquid composition as administered to the patient at a time. |
| "First Unit Dose" | The first in a sequence of dosage units of the composition administered to a patient. | First does of the non-aqueous liquid composition as administered to the patient at a time. |

ECF No. 59. The specific sections referencing these terms include independent claim 1 along with claims 3, 4, and 7:

1. A **composition** comprising nimodipine as the only active ingredient and one or more solvents selected from ethanol,

polyethylene glycol, and glycerin, wherein about 5% or less nimodipine degradation is observed over a period of at least six months when exposed to 40° C. and 75% relative humidity, and the concentration of nimodipine in the composition is about 6 mg/mL.

3. The composition of claim 1, wherein nimodipine is present in an amount from about 10 mg to about 100 mg per **dosage unit**.

4. The composition of claim 1, wherein nimodipine is present in an amount of about 60 mg per **dosage unit**.

7. The method of claim 5, wherein a **first unit dose** of the composition is administered to the patient within about 100 hours of the subarachnoid hemorrhage.

Pl.'s Open M. Br. at 5-6 (emphasis in original).[1]

### III.    LEGAL STANDARD

The ultimate question of the proper construction of a claim in a patent is a question of law for the court to determine. *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837, (2015) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-91 (1996) (explaining, "[w]hile we held in *Markman* that the ultimate issue of the proper construction of a claim should be treated as a question of law, we also recognized that in patent construction, subsidiary factfinding is sometimes necessary.")). A patent claim is that "'portion of the patent document that defines the scope of the patentee's rights.'" *Id.* (quoting *Markman*, 517 U.S. at 372).

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal citation and quotation marks omitted). "[T]here is no magic formula or catechism for conducting claim construction." *Id.* at 1324. Instead, the Court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent

---

[1] The terms "dosage unit" and "first unit dose" also appear in the asserted claims of the '787, '070, and '306 patents. *Id.*; *see also* Declaration of Jody Karol at Ex. 2, 3, 4.

law." *Id.* (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

"Claim construction begins with the intrinsic evidence of the patent—the claims, the specification, and the prosecution history—and may require consultation of extrinsic evidence to understand the state of the art during the relevant time period." *Merck Sharp & Dohme Corp. v. Teva Pharms. USA, Inc.*, No. 17-6921, 2019 WL 943532 at *2 (D.N.J. Feb. 26, 2019); *see also Phillips*, 415 F.3d at 1314–17. Ultimately, the goal of claim construction is to ascertain and secure for the patentee what was, in fact, invented. *See Phillips*, 415 F.3d at 1321-22 ("The patent system is based on the proposition that claims cover only the invented subject matter."); (citing *Smith v. Snow*, 294 U.S. 1, 14, (1935) ("if the claim were fairly susceptible of two constructions, that should be adopted which will secure to the patentee *his actual invention*") (emphasis added)).

The Federal Circuit has set forth an approach to claim construction. *In re Papst Licensing Digital Camera Patent Litigation*, 778 F.3d 1255, 1261 (Fed. Cir. 2015). In construing a patent claim, which should be considered in the mindset of a person having ordinary skill in the art ("POSA"):

> (1)    a court should give words of a claim their ordinary meaning in the context of the claim and the whole patent document;
>
> (2)    the specification particularly, but also the prosecution history, informs the determination of claim meaning in context, including by resolving ambiguities; and
>
> (3)    even if the meaning is plain on the face of the claim language, the patentee can, by acting with sufficient clarity, disclaim such a plain meaning or prescribe a special definition; and
>
> (4)    [the court should] apply, in particular, the principle that "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."

*In re Papst*, 778 F.3d at 1261 (citing *Phillips*, 415 F.3d at 1312-17) (explaining that claim terms should be given their ordinary and customary meaning to a person having ordinary skill in the art at the time of the effective date of the patent application). Each of these elements of claim construction are elucidated below.

### 1. Ordinary Meaning

To expand upon the above outlined approach, first, the court "looks to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." *Vitronics Corp.*, 90 F.3d at 1582. The "words of a claim 'are generally given their ordinary and customary meaning,'" which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d. at 1312–13 (quoting *Vitronics Corp.*, 90 F.3d at 1582).

A POSA "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313 (citing *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)). Accordingly, "the claims themselves provide substantial guidance as to the meaning of particular claim terms," and a court may look to "the context in which a term is used in the asserted claim" and "other claims of the patent in question, both asserted and unasserted." *See id.* at 1314.

### 2. Prosecution History and Specification

#### a. Prosecution History

Second, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980. "This history contains the complete record of all the proceedings before the Patent and Trademark Office [('PTO')], including any express representations made by the

applicant regarding the scope of the claims." *Vitronics Corp.*, 90 F.3d at 1582. "A patent's prosecution history, though less useful for claim construction purposes than the claim language and written description, plays various roles in resolving uncertainties about claim scope." *Mass. Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1118 (Fed. Cir. 2016) (internal quotation marks and citations omitted). The prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention. *Phillips*, 415 F.3d at 1317. For example, the prosecution history may "limit[] the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) (citation omitted). However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317. However, the prosecution history "still provides evidence of how the inventor intended the term to be construed." *Aventis Pharms., Inc.*, 715 F.3d at 1373 (citing *Lemelson v. Gen Mills, Inc.*, 968 F.2d 1202, 1206 (Fed. Cir. 1992).

### b. Specification

The specification is "always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp.*, 90 F.3d at 1582; *see also Phillips*, 415 F.3d at 1315 (noting that claims "are part of 'a fully integrated written instrument,' and 'must be read in view of the specification, of which they are a part'") (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978–79 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)). "Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than

their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Vitronics Corp.*, 90 F.3d at 1582.

However, while "[t]he written description and other parts of the specification [] may shed contextual light on the plain and ordinary meaning [], they cannot be used to narrow a claim term to deviate from the plain and ordinary meaning unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope." *Aventis Pharms. Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013).

### 3. Disavowal and Lexicography

#### a. Disavowal

To demonstrate disavowal, "the specification [or prosecution history] [must] make[] clear that the invention does not include a particular feature," or is clearly limited to a particular form of the invention." *Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014). (internal citation omitted). Disavowal "must be clear, but it need not be explicit." *Techtronic Indus. Co. v. ITC*, 944 F.3d 901, 907 (Fed. Cir. 2019) (citing *Trs. Of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016)). Courts have recognized that when the "specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1319 (Fed. Cir. 2006) (quoting *SciMed Life Sys. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001)); *see also Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1330 (Fed. Cir. 2009) ("[W]hen the preferred embodiment is described in the specification as the invention itself, the claims are not necessarily entitled to a scope broader than that embodiment.").

A court may infer disavowal "from clear limiting descriptions of the invention in the specification or prosecution history." *Techtronic Indus. Co.*, 944 F.3d at 907, (quoting *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012)). A court can find disavowal where the specification or prosecution history teach that a component is an important, critical, or essential to the invention. *See Blackbird Tech LLC v. ELB Elecs., Inc.*, 895 F.3d 1374, 1377-78 (Fed. Cir. 2018). Phrases that have signaled disavowal include: "the present invention includes," "the present invention is," and even simply "the present invention." *Id.* (citing *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016); *see also Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013). The patentee may also disavow claim scope "by distinguishing the claimed invention over the prior art." *Id.* (quoting *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997)).

Ultimately, as this court is directed by *Phillips*, the purpose of claim construction is to "capture the scope of the actual invention," and determine whether "the embodiments . . . define the outer limits of the claim term," or are "merely . . . exemplary in nature . . . in the context of the particular patent." *Techtronic Indus. Co.*, 944 F.3d at 907 (quoting *Phillips*, 415 F.3d at 1323-24).

### b. Lexicography

To demonstrate that a patentee acted as his or her own lexicographer, "a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning and must clearly express an intent to redefine the term." *Hill-Rom Servs., Inc.*, 755 F.3d at 1371 (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)) (internal quotations omitted); *see also CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 ("[T]he claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification

or prosecution history."). A patentee must define the specific terms used to describe the invention "with reasonable clarity, deliberateness, and precision." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

Further, "the specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). However, the embodiments in the specification—even if there is only one embodiment—cannot limit the scope of the claims absent the patentee's "words or expressions of manifest exclusion or restriction." *See Hill-Rom Servs., Inc.*, 755 F.3d at 1372 (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)). However, if a patentee choses to become his or her lexicographer, he or she "must be bound by the express definition." *Sinorgchem Co.*, 511 F.3d at 1136.

### 4. Most Naturally Aligned

The court should always apply the principle that "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *In re Papst*, 778 F.3d at 1261. "The close kinship between the written description and the claims is enforced by the statutory requirement that the specification describe the claimed invention in 'full, clear, concise, and exact terms.'" *Phillips*, 415 F.3d at 1316, (quoting 35 U.S.C. § 112, para. 1). Ultimately, the interpretation of a claim term can only be determined from "a full understanding of what the inventors actually invented and intended to envelop with the claim." *Id.*, quoting *Reinshaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998); *see also Markman*, 517 U.S. at 389 ("[A claim] term can be defined only in a way that comports with the instrument as a whole.").

### 5. Extrinsic Evidence

Finally, in some cases, the "district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015). "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980.

However, "[i]n those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper." *Vitronics Corp.*, 90 F.3d at 1583. "When an analysis of *intrinsic* evidence resolves any ambiguity in a disputed claim term, it is improper to rely on extrinsic evidence to contradict the meaning so ascertained." *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003) (emphasis in original). "Extrinsic evidence [] cannot be used to alter a claim construction dictated by a proper analysis of the intrinsic evidence." *On-Line Tech. v. Bodenseewerk Perkin-Elmer*, 386 F.3d 1133, 1139 (Fed. Cir. 2004) (citations omitted).

## IV.    CONSTRUCTION OF THE CLAIM TERMS

### A. Composition

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "Composition" | No construction required. | Liquid composition containing less than 1% water by volume, *i.e.*, non-aqueous liquid composition. |

### i. Plaintiff's Position

Plaintiff argues that the term composition does not require construction because "composition" has a well-established meaning to simply refer to a type of invention that is "simply a mixture of two or more components," and can be "universally applied." Markman Tr. at 8:13-18. Further, Plaintiff argues that the preamble is not limiting to the term "composition" as it appears in Claim 1 of the '277 patent, (Pl.'s Open M. Br. at 7-12), and that the term "non-aqueous" appears in the specification to describe the water limitation, and therefore is properly and intentionally not included in the independent claim of the patent, and to "read" the water limitation into the independent claim would be a "cardinal sin." Markman Tr. at 9:1-8. Therefore, according to Plaintiff, its position is supported by the specification and is consistent with the prosecution history, and therefore no extrinsic evidence needs to be utilized to understand this term.

Plaintiff asserts that Defendant's arguments do not meet the standards required for the Court to find disavowal or that Plaintiff had acted as its own lexicographer, and to accept such arguments would impermissibly introduce limiting language that would cause inconsistency, redundancy, and incoherency. Pl.'s Resp. Br. at 1. Plaintiff argues that this becomes more readily apparent when looking at Defendant's limitations across all of the parent patents: "if [Defendant's claim term] were applied equally across all Patents-in-Suit, the Non-Aqueous Patents would nonsensically claim 'non-aqueous liquid non-aqueous liquid compositions[.]'" Pl.'s Resp. Br. at 1.

Regarding the charge of lexicography, Plaintiff argues that it did not show a clear, express intent to redefine the term "composition" in its specification, with the most obvious example that the words "non-aqueous" and "composition" are not used interchangeably. Pl.'s Resp. Br. at 9. Regarding the Defendant's argument of disavowal, Plaintiff asserts that the specification and the

prosecution history of the '277 patent does not demonstrate a disavowal of compositions other than "non-aqueous liquids" because their description of the invention (the non-aqueous liquid composition "of" the present invention) is permissive and descriptive and not prescriptive or exclusive in comparison to phrases like the present invention "requires," "includes," or "is." Pl.'s Resp. Br. at 10. Plaintiff notes that disavowal must be clear and unmistakable with words or expressions of manifest exclusion or restriction in the intrinsic record, and that the examples from the specification cherry picked by Defendant does not show the requisite level of intent. Pl.'s Resp. Br. at 11.

Further, Plaintiff notes that the '277 patent and its parent patents did not distinguish their invention and disavow *all* aqueous compositions, just compositions having "significant" amounts of water, such as Nymalize. Pl.'s Resp. Br. at 12. Plaintiff also notes that an Examiner's reasons for allowance do not typically support disavowal because "it is the applicant, not the examiner, who must give up or disclaim subject matter that would otherwise fall within the scope of the claims." Pl.'s Resp. Br. at 13 (quoting *Sorenson v. Int'l Trade Comm'n.*, 427 F.3d 1375, 1379 (Fed. Cir. 2005)). Plaintiff further asserts that the property "non-aqueous" is not an inherent property or inseparable from the claimed structure. Pl.'s Resp. Br. at 13-14.

Finally, Plaintiff argues that the Court should disregard Defendant's expert's testimony because extrinsic evidence is not necessary for this case, as well as the fact that his declaration argues for an improperly narrow reading of the intrinsic evidence and that he admitted in his deposition that he never reviewed the Joint Claim Construction and Prehearing Statement, making his opinion unreliable. Pl.'s Resp. Br. at 17-18.

### ii.  Defendant's Position

Defendant argues that the dependent claims in '277 patent all reflect that the composition recited in claim 1 is "non-aqueous" liquid. Def.'s Open M. Br. at 9. When taken as a whole, the entirety of the '277 patent, from the title, Abstract, and the Detailed Description of the Invention, is limited to a non-aqueous liquid composition, and all of the embodiments of the alleged invention are non-aqueous and distinguished by that aspect from other liquid compositions. . Def.'s Open M. Br. at 12-13, 15-16. Additionally, Defendant points to the fact that composition is not a defined term in the patent itself and never appears in quotations, but rather is modified by "non-aqueous" or is otherwise being distinguished from aqueous composition over 80 times throughout the patent, and only found unmodified once (Def.'s Resp. Br. at 5-7), and there were zero disclosures related to any inventive aqueous composition. Markman Tr. at 29:3-14.

Defendant argues that the novel aspects of the invention are derived from the composition's "nonaqueous" nature. For example, Defendant points to the fact that the benefits, such as low degradation of the active ingredient described in the '277 patent, are attributed to the non-aqueous aspect of the liquid composition. Markman Tr. 23:16-19. Defendant also points to the prosecution history and notes how the Patent Office specifically understood the novelty of Plaintiff's invention was its non-aqueous composition: "Applicants' have demonstrated the stability of the non-aqueous composition comprising of nimodipine, solvents, ethanol (0.1-1.0% w/v), PEG and glycerol in Example 1, and in Tables I-V in comparison to the marketed oral nimodipine solution, Nymalize. . . . The closest prior art do not anticipate or teach nimodipine composition or its use in the method as claimed." Def.'s Open M. Br. at 19. Defendant argues that the prosecution history of the "parent patents" (the '787, '070, and the '306 patents) also used the same specification and distinguished

themselves based on their non-aqueous liquid composition to overcome prior art compositions that contained water. Def.'s Open M. Br. at 21.

Further, Defendant asserts that all of the parent patents' specifications "disavowed" the meaning of "composition" that "expands beyond a 'non-aqueous liquid'" through the consistent use of the term across each of the parent patents, which demonstrates that Plaintiff acted as its own lexicographer when defining the term "composition" within this patent family and the definition of which should be consistent and limited in the same way in the '277 patent. Def.'s Open M. Br. at 11. [2]

Defendant argues that the elimination of the word "non-aqueous" from the term "composition" in the '277 patent was not a "good faith attempt to capture a rightfully disclosed invention from the intrinsic record," but is in fact contrary to the intrinsic record, and was improperly motivated to stymy generic competition. Def.'s Open M. Br. at 5. Defendant argued that the '277 patent is different from its parent patents, not due to a change in the invention itself—the '277 patent has "the exact same specification,"—but due to the fact that during the '277 patent application process, Defendant sent Plaintiff the required ANDA notice letter that described how its product would not infringe Plaintiff's invention. Markman Tr. at 17:6-18. Defendant pointed to the fact that after the notice letter was sent, Plaintiff changed the claim scope of its patent application and dropped the "non-aqueous" limitation from its claims. Markman Tr. at 17:21-25.

Defendant notes that under 35 U.S.C. § 112, Plaintiff was required to identify where in the original patent application the inventor had support for the new "composition" claims, and Plaintiff cited to the specification that only described a non-aqueous liquid composition. Def.'s Resp. Br.

---

[2] Defendant points to a further incongruence between the parent patents and the '277 patent, and notes that the preamble to claim 1 in the '277 patent is claimed to be non-limiting by the Plaintiff, whereas all of the parent patents are limited by their preamble which limits those patents to non-aqueous compositions, arguing that the preamble should be so limited in the '277 as well. Def.'s Open M .Br. at 24.

at 10. Defendant argues that the construction that "most naturally aligns with the patent's description of the invention [is] the correct construction," and in this case, the invention is a non-aqueous composition, not just a "composition." Def.'s Resp. Br. at 2.[3]

Finally, Defendant notes that its expert, Dr. Walter Chambliss, reviewed the intrinsic record as a POSA and concluded that the contested claim term "composition" should be limited to "non-aqueous liquid composition" based on the fact that the only alleged invention in the '277 patent were all non-aqueous liquid compositions and because the specification repeatedly distinguishes between the novel non-aqueous liquid compositions and aqueous liquid compositions. *See* Def.'s Open M. Br. at 23-24.

### iii. Discussion

The Court finds that, for the reasons articulated below, the first claim-term, "composition," should be construed as "non-aqueous liquid composition."

### 1. Ordinary Meaning

The place to begin claim interpretation is from the perspective of how a POSA would understand the claim term at issue, not only in the context of the claim in which the disputed term appears, but in the context of the entire patent. *Phillips*, 415 F.3d at 1313. Plaintiff argues that "composition" is a universal term in patent law, and Defendant disagrees. *See* Markman Hearing Tr. at 8:12-19; 19:7-24. The term "composition" is a ubiquitous term in patent law, even being found in 35 U.S.C. § 101: "[w]hoever invents or discovers any new or useful process, machine,

---

[3] Defendant notes that when Plaintiff removed all references to "nonaqueous" from the patent it caused the Patent Office to flag the invention as distinct from the parent applications in this matter, which Defendant argues further supports their position that '277 was understood to be a "nonaqueous liquid composition" akin to its parent patents. Defendant discusses Application No. 17/530,728, the "source" of what became the '277 patent as well as a continuation-in-part application of U.S. Patent No. 11,517,563 (the "'563 patent") where Plaintiff removed all references to "non-aqueous" in the specification. Def.'s Resp. Br. at 12. The Patent Office flagged the patent as containing new subject matter, which prevents Plaintiff from utilizing the patent against Defendant's ANDA. *Id.* at 13.

manufacture, or composition of matter . . . may obtain a patent therefore, subject to the conditions and requirements of this title," encapsulating the concept of a chemical or other physical mixture that can be patented. However, the term composition is not a "universally" definite term in that its meaning heavily depends on the scope that the specification gives the term in the context of a given patent. *See Jazz Pharms., Inc. v. Roxane Labs., Inc.*, No. 10-6108, 2012 WL 4103880 at *12 (D.N.J. Sept. 14, 2012). Here, this Court must look to the claims where "composition" appears in the '277 patent, as well as review the specification to determine what "composition" encapsulates in this specific context.

In the '277 patent, the term "composition" appears in the following claims:

1. A composition comprising nimodipine as the only active ingredient and one or more solvents selected from 10 ethanol, polyethylene glycol, and glycerin, wherein about 5% or less nimodipine degradation is observed over a period of at least six months when exposed to 40° C. and 75% relative humidity, and the concentration of nimodipine in the composition is about 6 mg/mL.

2. The composition of claim 1, further comprising from about 0.01% to about 1.5% nimodipine related compound A.

3. The composition of claim 1, wherein nimodipine is present in an amount from about 10 mg to about 100 mg per dosage unit.

4. The composition of claim 1, wherein nimodipine is present in an amount of about 60 mg per dosage unit.

5. A method of improving neurological outcome by reducing the incidence and severity of ischemic deficits in patients with subarachnoid hemorrhage from ruptured intracranial berry aneurysms comprising enterally administering to a patient in need thereof an effective amount of the composition of claim 1.

6. The method of claim 5, wherein the composition is administered orally, via nasogastric tube or via gastric tube.

7. The method of claim 5, wherein a first unit dose of the composition is administered to the patient within about 100 hours of the subarachnoid hemorrhage.

8. The method of claim 5, wherein the composition is administered about every four hours.

Def.'s Open M. Br. at Ex. 1, 22:8-34.

Here, the word "composition" in the claim is, on its face, used in its plain and ordinary meaning, reflecting that the invention is a product of mixing or combining various elements or ingredients, which are listed following the contested term in claim 1.[4] This does not mean that the term "composition" does not need any construction whatsoever, and the Court must be prudent, review the patent in its entirety, and must to look to the specification, which is "always highly relevant to the claim construction analysis," especially because "[a]lthough words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Azurity Pharms., Inc. v. Amneal Pharms., LLC*, No. 21-08717, 2022 WL 3691392 at *3 (D.N.J. Aug. 24, 2022) (citing *Vitronics Corp.*, 90 F.3d at 1582).

Next, the Court must look at the preamble of the independent claim that introduces the term:

> 1. *A composition comprising nimodipine as the only active ingredient and one or more solvents selected from 10 ethanol, polyethylene glycol, and glycerin*, wherein about 5% or less nimodipine degradation is observed over a period of at least six months when exposed to 40° C. and 75% relative humidity, and the concentration of nimodipine in the composition is about 6 mg/mL.

Open M. Br. at Ex. 1, 22:8-14, (emphasis added).

---

[4] *See* Composition, in MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/composition (last visited Aug. 29, 2023). Although dictionaries technically fall within the category of extrinsic evidence, Judges are "free to consult such resources at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Vitronics Corp.*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996).

For a preamble to limit the claim term, it must "recite[] particular structure or steps that are highlighted as important by the specification" and where "the limitations in the body of the claim rely upon and derive antecedent basis from the preamble[.]" *Proveris Sci. Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1372 (Fed. Cir. 2014) (internal citations and quotations omitted).

The independent claim 1 includes the term "composition" as "a composition comprising nimodipine as the only active ingredient and one or more solvents selected from 10 ethanol, polyethylene glycol, and glycerin, wherein about 5% or less nimodipine degradation is observed over a period of at least six months when exposed to 40° C. and 75% relative humidity, and the concentration of nimodipine in the composition is about 6 mg/mL." *Id.* at 22:8-14. The Court notes that the parties have agreed that the preambles in the parent patents were limiting and disagree that the preamble in the '277 is similarly limiting. The Court finds that the preamble is limiting.

First, the preamble recites a particular structure that is clearly outlined as important throughout the specification. The "composition" lists the active ingredient and the particular solvents that the innovative solution can be comprised of: "nimodipine as the only active ingredient and one or more solvents *selected from* 10 ethanol, polyethylene glycol, and glycerin[.]" Def.'s Open M. Br. at Ex. 1, 22:8-14 (emphasis added). It is this particular selection of ingredients that "give life, meaning, and vitality" to the claimed innovation: it is this composition that creates a solution that reduces nimodipine degradation to about 5% or less over a period of at least six months when exposed to 40 C and 75% relative humidity, with the concentration of the active ingredient at about 6 mg/mL. *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1305 (Fed. Cir. 2005). The choice of solvents are all non-aqueous liquids.

Second, the preamble of claim 1 is the only independent claim that describes the inventive concept which the patent references back in each subsequent claim. *See* Def.'s Open M. Br. at Ex.

1, 22:8-34; *Poveris Sci. Corp.*, 739 F.3d at 1372-73; *see also Poly-Am., LP v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004) (construing preamble as limiting where it disclosed a "fundamental characteristic of the claimed invention"). "The composition" in the dependent claims clearly derives antecedent basis from "composition" from claim term 1 where it is described with greater detail.

Additionally, the specification further supports the Court's understanding that the '277 is so limited.

## 2.  Specification

Notably, although specification provides a Definitions section, it does not define "composition" within it: composition is not set off in quotations, nor does it follow any other indicia to indicate an explicit definition. *See Sinorgchem Co. v. ITC*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) (noting when a term is set off by quotation marks, it is considered a strong indication that a definition follows); *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009) (noting the use of "i.e" signals sufficient intent to define the preceding word). In fact, the Definition section begins with the definition for "by volume":

> I. Definitions
>
> Pharmaceutical compositions and medicaments may be described as mixtures of two or more components "by volume," which is herein defined as the volume due to one component divided by the volume of all components of the pharmaceutical composition.

Def.'s Open M. Br. at 4:49-55. The term "composition" appears here as the general term, not in reference to the invention covered by the '277 patent. However, the specification as a whole provides ample discussion and embodiments of the invention, which the Court finds sufficient to determine that the patentee disavowed aqueous liquid compositions as discussed below.

### 3. Special Definition

#### a. Disavowal

Disavowal requires that "the specification [or prosecution history] make[] clear that the invention does not include a particular feature." *Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.*, 133 F. Supp. 3d 692, 700 (D.N.J. 2015) (internal citation and quotations omitted). However, it need not be explicit. *See Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363-64 (Fed. Cir. 2016) (collecting cases). "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *SciMed Life Sys. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). The Court finds this to be true in the present case.

Here, the specification makes clear that the invention embodied by the '277 patent does not include aqueous solutions, and the invention is non-aqueous. The title of the patent begins with "Non-Aqueous Liquid Nimodipine Compositions," and presents the Field of the Invention as "[t]he present invention relates generally to non-aqueous liquid nimodipine compositions with improved stability compared to aqueous compositions comprising nimodipine." Def.'s Open M. Br. at Ex. 1, 1:13-15. In the background section, the patentee outlines the problems inherent to the formulation of prior inventions, the most recent being NYMALIZE® which provided physicians an oral nimodipine solution which included water at about 20% by volume and suffered from issues related to degradation of the active ingredient. *Id.* 1:65-2:31. The patentee immediately describes its invention, at the very top of the Summary of the Invention, as a "novel non-aqueous liquid pharmaceutical compositions containing nimodipine that have improved shelf-life and

decreased nimodipine-related degradation compared to existing aqueous liquid pharmaceutical compositions." *Id.* 2:35-39. The summary outlines several possible embodiments and all of them begin "the present invention provides a non-aqueous liquid composition" and compares the invention against NYMALIZE®. *Id.* 2:40-41; 2:46-47; 2:51-53; 2:56-57; 2:61-62; 2:66-67; 3:6-7; 3:14-15; 3:22-23; 3:27-28; 3:33-34; 3:41-42; 3:46-47; 3:52-53; 3:57-58; 3:66-67; 4:4-5; 4:8-10; 4:15-16; 4:23-24. This pattern repeats in the Composition section of the '277 patent as well, with every instance of the embodiment being described as a "non-aqueous" composition. *Id.* at 6:11-14:60.

The specification continues to set the inventive non-aqueous liquid composition apart from its aqueous predecessor. In the Detailed Description of the Invention, the comparison between the novel non-aqueous versus the prior aqueous solution is even more explicit: "[t]he *present invention* relates to *non-aqueous liquid compositions* comprising nimodipine. The liquid compositions of the invention have improved stability and decreased degradants *compared to existing aqueous liquid pharmaceutical compositions. e.g. NYMALIZE®.*" *Id.* at 4:41-45 (emphasis added). Further, in the Methods section, the example stability study continues to compare specifically "non-aqueous liquid compositions of the present invention" to aqueous NYMALIZE®. *Id.* at 16:8-18:39 (inclusive of Table V). As Defendant noted at the Markman hearing, the innovative composition has been described as "non-aqueous" over 100 times in the '277 patent, and the only aqueous solution presented was NYMALIZE® for comparative purposes, to demonstrate the invention's superior preservation of the active ingredient. *See* Markman Tr. at 30:4-14; *see also* Def.'s Resp. Br. at 13. The Court would be hard pressed to conclude that the '277 patent intended to include anything but non-aqueous liquid compositions. The specification here makes clear that the invention does not include aqueous solutions.

### b. Prosecution History

The Court also finds that the prosecution history supports the conclusion that the '277 patent encompasses non-aqueous liquid compositions. The Court notes that the '277 patent is derived from a line of patents: '787, '070, and '306 (the "parent patents"). Where multiple patents "derive from the same parent application and share many common terms, [the Court] must interpret the claims consistently across all asserted patents." *Trs. Of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1369 (Fed. Cir. 2016) (internal citations and quotations omitted). Plaintiff asserted in its Markman presentation that if the Court were to determine that the contested claim term "composition" in the '277 patent is limited to "non-aqueous liquid" compositions, it would violate the above rule and cause the parent patents to read "A liquid, liquid composition containing less than one percent water by volume, containing less than one percent water by volume." Markman Tr. at 10:16-22. The Court does not believe that such an interpretation is the natural consequence of finding that the '277 patent's term "composition" should be constructed as "a non-aqueous liquid composition." Moreover, the prosecution history of the '277 patent and its derivation from the parent patents supports the conclusion that the '277 patent protects a novel non-aqueous liquid composition.

The '277 patent is a continuation of Application No. 17/530,728, filed on November 19, 2021, which is a continuation of the now '306 patent, its application filed on December 20, 2019, which is a continuation of the now '070 patent, its application filed on May 9, 2019, which is a continuation of the now '787 patent, its application filed on April 16, 2018. The original application filed for what now is the '277 patent described the invention as a "non-aqueous liquid composition" as did all the parent patents. Def.'s Open M. Br. at Ex. 2 at 2-3; Ex. 7 at 8, 12-14; Ex. 8 at 9-14; Ex. 9 at 1; Ex. 10 at 2; *see also* Markman Tr. at 13:24-14:2. Then on December 22,

2021, the patentee cancelled the pending claims prior to prosecution and replaced "non-aqueous liquid composition" with just "composition" in the independent claim. *Id.* at Ex. 2 at 2-3. The patentee cited the as-filed specification for support of the "new claims." *Id.* at 4. However, that specification reflects the invention to be a non-aqueous liquid composition comprised of nimodipine and essentially is a mirror image of the final specification: all aspects of the specification reflect the novel invention to be non-aqueous, liquid compositions and only compare against the aqueous NYMALIZE® solution. *See id.* at Ex. 3.

During the prosecution of what became the '277 patent, the patentee also traversed the rejection of the amended independent claim by again differentiating itself from NYMALIZE® and demonstrated the novel utility of the invention was the lack of degradation of nimodipine over time under specific environmental conditions. *Id.* at Ex. 4. It is clear from the specification that this innovation was due to the non-aqueous nature of the invention. *See id.* at Ex. 3. The Examiner's reasons for allowance specifically highlighted that the "[a]pplicants' have demonstrated the *stability of the non-aqueous composition* comprising nimodipine, solvents, ethanol (0.1-1.0% w/v), PEG and glycerol in Example 1, and in Tables I-V in comparison to the marketed oral nimodipine solution, Nymalize." *Id.* at Ex. 5. Further, the Examiner tied the non-aqueous composition to the innovative results that made the composition patentable. *Id.*

Thus, the as-filed specification and the Examiner's justification for allowing the application to proceed to be patented lead the Court to the understanding that the innovative creation of the '277 patent is a non-aqueous liquid solution. This is further supported by the fact that the parties agree that the parent patents, from which the '277 is derived, all relate to non-aqueous liquid compositions and have limiting preambles. *See* Markman Tr. at 13:24-14:2. The parent patents have particular relevance here because "[w]hen multiple patents derive from the

same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999); *see also Supernus Pharms., Inc. v. Ajanta Pharma Ltd.*, No. 21-14628, 2022 WL 17400943 at * (D.N.J. Dec. 1, 2022) ("[when the] patents in suit are part of the same patent family, the prosecution history of related patents is relevant to all patents in that family.") (internal quotations omitted).

Here, the prosecution of the parent patents reflects that, in order to overcome prior art, the patentee consistently distinguished its invention as non-aqueous. *See* Def.'s Open M. Br. at Ex. 7 at 8, 12-14; Ex. 8 at 9-14; Ex. 9 at 2; Ex. 11 at 3-16 (showing that the '787, the '070, and the '306 patents all discuss the patentability of the novel composition due to its non-aqueous nature). The same prior art, such as NYMALIZE® and Zhang, are also discussed and traversed in substantially the same way in the prosecution of the '277 patent. *Id.* at Ex. 4 at 5-6; Ex. 5 at 3.[5] This too supports the Court's understanding that the term "composition" in the '277 patent should be constructed as a non-aqueous liquid composition.

On December 22, 2021, Plaintiff modified the independent claim from "non-aqueous liquid composition" to "composition" in Application No. 17/530,728 (what would become the '277 patent). From that same application, Plaintiff also filed a continuation-in-part, resulting in the '563 patent, which defines the invention as a "liquid composition" throughout the specification as well as within the independent claim. Def.'s Open M. Br. at Ex. 2 at 2-3; Def.'s Resp. Br. at 12, Ex. Nos. 1 & 2. As discussed above, the justification cited by the patentee for the change to the term "composition" in the independent claim in what became the '277 patent was the then-filed

---

[5] As discussed above, NYMALIZE® is an aqueous solution, and Zhang, although a non-aqueous invention, was created to solubilize its non-aqueous composition when mixed with an aqueous injectable composition and was thus formulated with a critical phospholipid that the parent patents here did not require because of its non-aqueous only (i.e., non-injectable) delivery method. *See* Def.'s Open M. Br. at Ex. 10 at 7.

specification, which distinguished its novel invention as non-aqueous. The Court cannot ignore the timing of the term change and the filing of the '563 patent that contained new subject matter (which was flagged by the Patent Office and noted the filing date of March 30, 2022, meaning it would not receive the benefit of the filing date of the parent application) and Plaintiff's cancellation of the claims to exclude "non-aqueous liquid" in what would become the '277 patent vis-à-vis Defendant's Notice Letter dated November 29, 2021. *See* Def.'s Resp. Br. at 13, 13 n.5; Def.'s Markman Presentation Packet at 21. Defendant specifically noted in its Notice Letter that the ANDA product would not infringe because the ANDA product is not a non-aqueous liquid composition. *Id.* The timing of these attempts to broaden the claim language of "composition" is suspicious at best, and at worst, undermines the public's right to rely on the defined scope of an invention and otherwise would make it impossible for new inventions to be designed appropriately around these patents. *Wallace London & Clemco Prods. v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed. Cir. 1991) (noting that "[d]esigning or inventing around patents to make new inventions is encouraged").

While the Court notes that "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation," and therefore should be reviewed with care in relation to the more significant evidence from the claim terms themselves and the specification, *see Phillips*, 415 F.3d at 1317, the prosecution history is still relevant in that it "still provides evidence of how the inventor intended the term to be construed." *Aventis Pharms., Inc.*, 715 F.3d at 1373. Here, the prosecution history has been carefully considered and serves only to support what the specification clearly demonstrates: the term "composition" should be limited to "non-aqueous liquid composition."

#### 4.  Most Naturally Aligned

As the Federal Circuit has instructed, the Court should apply the principle that "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *In re Papst*, 778 F.3d at 1261 (citing *Phillips*, 415 F.3d at 1312-17). The Court concludes that Defendant's construction is most consistent with the claim-term, the language within the specification, and the invention as a whole, and rejects Plaintiff's insistence that "composition" need not be defined. Given the strength of the intrinsic record, the Court finds that this is one of those cases where the public record unambiguously describes the scope of the patented invention, and therefore "reliance on any extrinsic evidence [would be] improper." *Vitronics Corp.*, 90 F.3d at 1583. Thus, the Court will not venture into the arguments relating to Defendant's expert or any other extrinsic sources.

### B.  Dosage Unit and First Unit Dose

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "Dosage Unit" | One dose of the composition as administered to a patient at a time. | One dose of the non-aqueous liquid composition as administered to the patient at a time. |
| "First Unit Dose" | The first in a sequence of dosage units of the composition administered to a patient. | First dose of the non-aqueous liquid composition as administered to the patient at a time. |

The Parties have consistently presented their arguments for the two claim terms, "dosage unit" and "first unit dose" together in their motion practice and at the Markman hearing. Usually, the Court must undertake an examination into each claim term separately, however here the Court notes that the '277 patent itself states that these terms are used interchangeably within it. *See* Def.'s Open M. Br. at Ex. 1, 5:11-12. According to the Merriam-Webster Dictionary, the definition of "interchangeable" is "capable of being interchanged, especially permitting mutual substitution."[6] Therefore, the Court will review the Parties' arguments, and undertake the four-step analysis as outlined in *Phillips*.

### 1. Plaintiff's Position

Plaintiff argues that there is no substantive dispute regarding the term "dosage unit" or "first unit dose" and that Defendant is attempting to impermissibly insert a limitation into the dependent claims of the '277 patent. Pl.'s Open M. Br. at 13. Plaintiff asserts that the terms are easily understood as the amount of the claimed composition to be administered to a patient and do not need to be defined further. *Id.*

### 2. Defendant's Position

Defendant argues that the construction of these terms are taken "verbatim from the definition Plaintiff set forth in the specification," (Def.'s Open M. Br. at 25), and notes that the terms appear and are described with the modifier "non-aqueous liquid composition" in the specification's definition section. Markman Tr. at 34:7-16. Therefore, Defendant argues that this demonstrates Plaintiff's explicit and intended lexicography for these terms, and that to vary from this construction ignores the intrinsic record. Def.'s Open M. Br. at 26. Defendant also argues that

---

[6] *See* Interchangeable, in MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/interchangeable (last visited Aug. 29, 2023). *See also supra* n.4.

the definitions Plaintiff now presents for these terms imports additional words that are not supported or found in the specification. *Id.* at 27.

### ii. Discussion

The Court finds that, for the reasons articulated below as applied to the claim term "dosage unit," and "first unit dose," Plaintiff acted as its own lexicographer and must be bound by the express definition as laid out in the specification.

### 1. Ordinary Meaning

First, the Court must begin by reviewing the contested claim terms, which appear in the dependent claims 3, 4, and 7.

> 3. The composition of claim 1, wherein nimodipine is present in an amount from about 10 mg to about 100 mg per dosage unit.
>
> 4. The composition of claim 1, wherein nimodipine is present in an amount of about 60 mg per dosage unit.
>
> 7. The method of claim 5, wherein a first unit dose of the composition is administered to the patient within about 100 hours of the subarachnoid hemorrhage.

Def.'s Open M. Br. at Ex. 1, 22:17-21; 30-32.

At first blush, it appears that the claims are utilizing the plain and ordinary meaning of "dosage unit" and "first unit dose." However, as guided by *Phillips*, the specification is "the single best guide" to determine the meaning of a disputed term, and thus the Court must review the specification. *Phillips*, 415 F.3d at 1315.

### 2. Specification and Prosecution History

The Court finds that the claim term appears in the Detailed Description of the Invention under the Definitions section:

> As used herein, the term "dosage unit" or "unit dose" (used interchangeably) refers to one dose of the non-aqueous liquid composition of the present invention, as administered to the patient.

Def.'s Open M. Br. at Ex. 1, 5:11-14. This suggests that Plaintiff intended to have a more specific, special definition to the term "dosage unit" and "unit dose" than it would otherwise possess.

### 3.  Special Definition

#### a.  Lexicography

Here, the Court notes that there are many indicia that Plaintiff intended to specifically define "dosage unit" and "first unit dose." First, the terms "dosage unit" and "unit dose" appear in the Definitions section of the Patent. Def.'s Open M. Br. at Ex. 1, 5:11. Second, the terms "dosage unit" and "unit dose" are set off by quotation marks. *Id.* When a term is set off by quotation marks, it is considered a "strong indication" that a definition follows. *Sinorgchem Co.*, 511 F.3d at 1136. Additionally, the specification illustrates this understanding of "dosage unit" and "unit dose":

> For example. multiple dosage units can be present when the non-aqueous liquid composition of the present invention is stored in a bottle. A fraction of that bottle, i.e. a single dosage unit, is administered to the patient at a time.

Def.'s Open M. Br. at Ex. 1, 5:14-18. The use of "i.e" signals "sufficient intent to define the preceding word." See *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009). Here, in the specification, we can see that the definition clearly refers back to "the non-aqueous liquid composition of the present invention."

Here, it is clear that the drafter deliberately and precisely defined the terms "dosage unit" and "unit dose" to be one dose of the non-aqueous liquid composition of the present invention, as administered to the patient at one time. "When the specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term." *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998). Thus, the Court is satisfied that the specification has clearly defined the contested terms

"dosage unit" and "first unit dose" and need not further its examination to extrinsic evidence or prosecutorial history.

### 4.  Most Naturally Aligned

The Court concludes that Defendant's construction is most consistent with the claim-term itself, the language within the specification, and the invention as a whole, and rejects Plaintiff's proposed definition of "one dose of the composition as administered to a patient at a time." Plaintiff has already defined the term "dosage unit" and "unit dose" in the specification of the '277 patent, and it must be bound by its own lexicography. This must be so: a "patentee is required to define precisely what his invention is, the Court explained, it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms." *Phillips*, 415 F.3d at 1325-26. The public needs to have notice of what the patentee and the Patent and Trademark Office "have agreed to constitute the metes and bounds of the claimed invention[,]" and to construe the terms "dosage unit" and "unit dose" otherwise would make it impossible for new inventions to be designed appropriately around these patents. *Wallace London & Clemco Prods.*, 946 F.2d at 1538.

The Court finds that Defendant's construction, pulled from the Definition section of the patent itself, is "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention" and is, "in the end, the correct construction." *In re Papst*, 778 F.3d at 1261.

## V.    CONCLUSION

The Court concludes that any reasonable reader of ordinary skill in the art would examine this patent and understand the claim terms as the Court has found herein.

An appropriate Order consistent with this Opinion will be entered.

August 30, 2023

KAREN M. WILLIAMS, U.S.D.J.